IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT, | ) ) ) | Case No. CV-06-277-E-BLW |
| Plaintiff, | ) ) | **MEMORANDUM DECISION** |
| v. | ) ) ) | |
| UNITED STATES FOREST SERVICE, | ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

## INTRODUCTION

The Court has before it cross-motions for summary judgment.  The Court

has heard oral argument and fully reviewed the extensive Administrative Record.[1]

For the reasons expressed below, the Court will grant the motion of plaintiff

Western Watersheds Project and deny the other motions.

## SUMMARY

Plaintiff WWP seeks review of a decision by the Fish and Wildlife Service

(FWS) rejecting petitions to list the greater sage-grouse under the Endangered

---

[1]  The Administrative Record in this case was contained in 8 CDs (including the e-mails). The information on the CDs was not set forth in an easy-to-find format.  Consequently, the Court had a very difficult time locating documents.  In the future, Government counsel should work together with the agency to ensure that the Administrative Record can be easily accessed.

**Memorandum Decision – Page 1**

Species Act (ESA).  Sage-grouse populations have been in significant decline for decades.  While the rate of decline has recently slowed, the sage-grouse's habitat is being subjected to accelerating threats from invasive weeds, fires, energy development, and livestock grazing.  About one-half of the original area occupied by the sage-grouse is no longer capable of supporting sage-grouse on a year-round basis.  For these reasons, the Bureau of Land Management and the Forest Service have both listed the sage-grouse as a "sensitive species" across its entire range in the United States.

These circumstances prompted various groups to file petitions with the FWS seeking listing of the sage-grouse under the ESA.  That law required the FWS to use the "best science" to determine whether the sage-grouse is an endangered or threatened species.  The FWS determined that a listing was not warranted.

After reviewing the FWS's decision, the Court finds three flaws with the FWS decision-making process:  (1) While the FWS consulted with experts, the agency excluded them from the listing decision; (2) The FWS created no detailed record of the experts' opinions; and (3) The FWS ignored that portion of the experts' opinions that were preserved on the record.

This process violates the statutory requirement that the "best science" be applied.  By improperly insulating the decision-makers from scientific input, it

**Memorandum Decision – Page 2**

creates opacity when transparency is required.   The Court has serious reservations

about whether such a process may be used again in any reevaluation of the sage-

grouse or, for that matter, in any other listing decisions in the future.

Furthermore, the FWS decision lacked a coherent analysis of the

deterioration of habitat and the regulatory mechanisms designed to protect the

sage-grouse.  Finally, the FWS decision was tainted by the inexcusable conduct of

one of its own executives.  Julie MacDonald, a Deputy Assistant Secretary who

was neither a scientist nor a sage-grouse expert, had a well-documented history of

intervening in the listing process to ensure that the "best science" supported a

decision not to list the species.  Her tactics included everything from editing

scientific conclusions to intimidating FWS staffers.  Her extensive involvement in

the sage-grouse listing decision process taints the FWS's decision and requires a

reconsideration without her involvement.

## ANALYSIS

1.  <u>**The ESA**</u>

Congress enacted the ESA in 1973 "to provide a means whereby the

ecosystems upon which endangered species and threatened species depend may be

conserved, [and] to provide a program for the conservation of such endangered

species and threatened species." 16 U.S.C. § 1531(b).  Section 4 of the ESA directs

**Memorandum Decision – Page 3**

the Secretary to determine which species should be listed as endangered or threatened. *Id.* at § 1533(a)(1).  The Secretary has delegated this duty to the FWS.

An endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range" and a threatened species is one "which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* at §§ 1532(6), (20).  In deciding whether or not a species qualifies as endangered or threatened, the FWS is required to consider the following five factors:  (1) the present or threatened destruction, modification, or curtailment of its habitat or range; (2) overutilization for commercial, recreational, scientific, or educational purposes; (3) disease or predation; (4) the inadequacy of existing regulatory mechanisms; and (5) other natural or manmade factors affecting its continued existence.  *Id.* at § 1533(a)(1).

The Director of the FWS must make listing determinations "solely on the basis of the best scientific and commercial data available to him [or her] after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation . . . to protect such species." *Id.* at § 1533(b)(1)(a).  A species may be "listed" as endangered or threatened under the ESA in one of two ways, either on the initiative of the Secretary through the "candidate process," or as a result of a petition submitted by

**Memorandum Decision – Page 4**

an "interested person." *Id.* at § 1533(b)(3)(A).  In this case it was a series of petitions filed with the FWS that initiated the process.

Once it receives a petition to list a species, the FWS must, within 90 days, determine whether the petition presents "substantial scientific or commercial information indicating that the petitioned action may be warranted." *Id.* This is commonly referred to as the "90-day finding." The ESA's implementing regulations define "substantial information" as the "amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted." 50 C.F.R. § 424.14(b)(1).

The 90-day finding is based solely on the petition; the FWS does not conduct independent research to confirm the petition's assertions.  *See* 69 Fed.Reg. at 21485.  If the FWS makes a "positive" 90-day finding, it begins a "review of the status of the species concerned" and, within one year of the receipt of the petition, must make a second finding (commonly referred to as the "12-month finding") that either: (a) the petitioned action is not warranted; (b) the petitioned action is warranted; or (c) the petitioned action is warranted but precluded by higher priority pending proposals and expeditious progress is being made to list, delist, or reclassify.  *See* 16 U.S.C. § 1533(b)(3)(B); 50 C.F.R. § 424.14.

## 2.   Sage-Grouse 90-Day Finding

Between 2002 and 2003, the FWS received three petitions to list the greater sage-grouse (*Centrocercus Urophasianus*) as an endangered species under the Endangered Species Act (ESA). On April 21, 2004, the FWS filed its 90-day finding, concluded that the petitions present "substantial information indicating that listing the greater sage-grouse may be warranted." *See 69 Fed. Reg.* at 21484-94.

The FWS's analysis began with a description of sage-grouse, their habitat, and their current status. The greater sage-grouse is the largest species of grouse in North America. *Id.* at p. 21485. It was described in the journal entry of Meriwether Lewis for June 5, 1805, while he was in the territory that would become Montana. *See Conservation Assessment* at p. 3-1. At that time, there may have been 1.1 million of the birds ranging over an area now comprising 16 western states and 3 Canadian provinces. *69 Fed. Reg.* at 21486. Today, population estimates range from 100,000 to 500,000, and the range has been reduced to 11 western states and 2 Canadian provinces. *Id.* Their population numbers "may have declined between 69 and 99 percent from historic to recent times." *Id.*

The "primary explanation" given by the FWS for this population decline was "[h]abitat alteration, through loss and degradation . . . ." *Id.* at p. 21490. Sage-grouse habitat is tied to several species of sagebrush. Throughout much of the year

adult sage-grouse rely on sagebrush to provide roosting cover and food.  During

the winter they depend almost exclusively on sagebrush for food.  *69 Fed. Reg.* at

p. 21486.

The habitat loss was "due in large part to human actions rather than natural

events."  *Id*. at 21492.  The FWS identified a number of causes for this habitat loss,

including (1) agriculture ("millions of hectares of native sagebrush habitat have

been cultivated for [agricultural] production"), (2) herbicides ("[c]hemical control

of sagebrush has resulted in major declines of sage-grouse breeding populations

through the loss of sagebrush cover"), (3) grazing ("grazing by livestock could

reduce breeding habitat"), (4) fire ("[w]ildfires have destroyed extensive areas of

sagebrush habitat in recent years," and these fires allowed invasion of cheatgrass,

"an exotic species that is unsuitable as sage-grouse habitat"), and (5) development

("sage-grouse habitats also are fragmented by fences, powerlines, roads and other

facilities associated with grazing, energy development, urban/suburban

development [etc.] . . . .").  *Id*. at 21488-90.

The FWS also expressed concern that federal and state agencies had no plans

in place to protect habitat.  For example, the FWS concluded that it "is not aware

of any State regulations that conserve greater sage-grouse habitat or encourage

habitat conservation efforts on private lands."  *Id*. at 21492.  The FWS also found

**Memorandum Decision – Page 7**

that although a large portion of habitat occurs on BLM lands – and the BLM has

designated the sage-grouse as a special status species in 5 of 11 states – there were

no regulations requiring that BLM land use plans specifically address the

conservation needs of special status species.  *Id.*  With regard to habitat on lands

managed by other federal agencies, the FWS concluded that with the exception of

one program, "we are unaware of any other agency efforts to protect and conserve

sage-grouse on these Federal lands."  *Id.*

The FWS observed that sage-grouse were susceptible to the West Nile

Virus, which was spreading into the birds' range, and "warrants further

investigation."  *Id*. at p. 21491.  In conclusion, the FWS found that although the

petitions contained "minor errors," they did "contain accurate information, which

we have confirmed through our review of the scientific, peer-reviewed literature

and direct communications with species experts."  *Id*. at p. 21494.  The FWS found

that there was substantial information in the petitions to indicate that listing of the

greater sage-grouse may be warranted.  That finding was based "primarily on the

historic and current destruction, modification, or curtailment of greater sage-grouse

habitat or range, and the inadequacy of existing regulatory mechanisms in

protecting greater sage-grouse habitats throughout the species' range."  *Id.*

**3.**     **Conservation Assessment**

**Memorandum Decision – Page 8**

About two months after the FWS found that listing may be warranted, and was seeking public comments, a report called the Conservation Assessment (CA) was issued by a group of State agency wildlife biologists who were experts on the sage-grouse. The CA was peer-reviewed by an independent group of scientists selected by the Ecological Society of America. *See 70 Fed. Reg.* at p. 2249.

The CA analyzed sage-grouse population trends from 1965 to 2003, first for states and then range-wide. The state-wide assessment showed that (1) 11 of 13 states and provinces showed "significant long-term declines in size of active leks"; (2) 8 of 10 states showed "population declines over the same time frame"; and (3) 2 of 10 states "appeared to be stable or slightly increasing." *Conservation Assessment* at p. ES-4. Only California had an increase in both the population index and lek size. *Id.*

The range-wide assessment showed that "[s]age-grouse populations declined at an overall rate of 2.0% per year from 1965 to 2003." *Id*. at ES-5. The population drop was more pronounced from 1965 to 1985, a decline of 3.5%. *Id.* From 1986 to 2003, the population declined at a lower rate of .4%. *Id.* Despite the lower rate of decline, the CA concluded that "we are not optimistic about the future of sage-grouse because of long-term population declines coupled with continued loss and degradation of habitat and other factors (including West Nile Virus). *Id.*

The CA discussed in detail the continued loss of habitat.  For example, it observed that a non-native annual grass known as cheatgrass was spreading rapidly and "replacing sagebrush."  *Id*. at 7-14.  With regard to the Great Basin, "[n]early 80% of the land area . . . is susceptible to displacement by cheatgrass."  *Id*. at p. 7-17.  The "increased flammability" of cheatgrass causes "increased fire intensity and frequency."  *Id*. at 7-14.  Both the number of fires and the total area burned have increased dramatically in the last decade when compared with the past 100 years.  *Id*. at 7-70 (Fig. 7.1).  The CA warned that periods of drought and global climate change could further facilitate cheatgrass invasion or exacerbate the fire regime, and thus "accelerate the loss of sagebrush habitats."  *Id*. at p. 7-18.  The long-term result is that "the increased areas burned each year coupled with decreased total area of sagebrush habitats can further accelerate the trajectory of habitat loss for sage-grouse."  *Id*. at p. 7-7.

Additional long-term problems were expected to be caused by increased oil and gas development.  Existing development "influenced 28% of the sagebrush habitats within the [Assessment] study area," and caused a "direct loss of habitat." *Id*. at 7-40, 7-42.  Increases in demand for oil and gas have led to increased demand for drilling permits.  For example, in the Powder River Basin (extending through sage-grouse range in Montana and Wyoming), while  15,811 wells have

been approved, an additional 65,635 "are being considered . . . ." *Id*. at 7-42; Fig.

7-30.  This was no isolated instance: "[T]he [BLM] anticipates receiving large

numbers of applications for permits to drill."  *Id*. at 13-7.  The CA noted that

because 96% of all drilling permit applications are approved, "the frequency and

extent of oil and gas development on sagebrush ecosystems are likely to increase

. . . ." *Id*.

In summary, "the western landscape has been subjected to a new suite of

intense, frequent, or continuous disturbances."  *Id*. at p. 13-6.  It is the "cumulative

impacts of the disturbances, rather than any single source, [that] may be the most

significant influence on the trajectory of sagebrush ecosystems." *Id*. at p. 13-8.

And that "trajectory," in the opinion of the experts who drafted the Assessment, is

headed in a negative direction:  "[W]e are not optimistic about the future of sage-

grouse because of long-term population declines coupled with continued loss and

degradation of habitat and other factors (including West Nile Virus)."  *Id*. at p. ES-

5.

**4.  12-Month Finding Process – PECE**

To begin the process of drafting its 12-month finding, the FWS began by

evaluating information on individual planned conservation efforts.  Their

evaluation was conducted under the FWS's Policy for Evaluation of Conservation

Efforts When Making Listing Decisions ("PECE").  *See* 68 Fed. Reg. 15100,

15115 (Mar. 28, 2003).  Recognizing that conservation efforts might vary in

effectiveness, PECE dictates that "conservation efforts that are not sufficiently

certain to be implemented and effective cannot contribute to a determination that

listing is unnecessary or a determination to list as threatened rather than

endangered." *Id.* at 15115.  Evaluating over 300 plans from state and federal

agencies, among others, the FWS determined that 20 of them met PECE standards

and should be included in the information used for the extinction risk evaluation.

*See* 70 Fed. Reg. at 2251.

5.      **12-Month Finding Process – Expert Panel**

        The FWS then moved to the risk analysis stage, where the FWS considered

"how great a danger the greater sage grouse faces of becoming extinct."  *See* GSG

Emails 13378.  To identify this danger, the FWS convened a panel of seven outside

scientists with expertise in sage-grouse biology and ecology, sagebrush community

ecology, and range ecology and management.  *See 70 Fed.Reg.* at 2249-51; *AR* at

pp. 11072-11168 (setting forth qualifications of each of the expert panelists).

        Over the course of two days, the panel of experts discussed the threats to

sage-grouse across its range.  *Id* at 2279.  The FWS purposefully did not ask the

expert panel to consider or discuss WWP's petition or whether, as a matter of

regulatory policy, the sage-grouse should be listed as endangered or threatened. *Id*.
Instead, the panel was asked when the sage-grouse would become extinct. *Id*. at
10930.

The expert panel did not issue any written report. Instead, they discussed
extinction risks in the presence of a management team that would make the
ultimate listing decision. In addition, each expert panelist (1) ranked the threats to
the sage-grouse, and (2) voted on "how far in the future you anticipate that greater
sage-grouse will become extinct." The votes and rankings are part of the
Administrative Record, but there is no written analysis from any member of the
expert panel explaining either the votes or rankings.

With regard to the threat rankings, the expert panelists found that the top
range-wide threats to the sage-grouse were, in order, (1) invasive species, (2)
infrastructure, (3) wildfire, (4) agriculture, (5) grazing, (6) energy development, (7)
urbanization, (8) strip/coal mining, (9) weather, and (10) pinyon-juniper expansion
(followed by eight other threats). *Id*. at 2280; *AR* at p. 10921. In the eastern
portion of the sage grouse's range, the top two threats were energy development
and infrastructure, while in the west, the top two threats were invasive species and
wildfire. *See AR* at pp. 10922-10923.

Each expert panelist was then given 100 points, and asked to assign them

over seven time intervals representing the likelihood that the greater sage-grouse would become extinct in that time-frame (1-20 years, 21-40, 41-60, 61-80, 81-100, 101-200 and 200+ years).  *See AR* at pp. 10930-10950.  The experts were asked to conduct three scorings for each geographical region.

The first scoring was done after the FWS's presentations on the life history, intrinsic and extrinsic factors, and population trends of sage-grouse.  *See* GSG Emails 13378-13385. The second scoring was conducted after the expert panel had reviewed the individual first scores (anonymously) and engaged in a facilitated discussion of the results.  *See* GSG Emails 13380-13381. The purpose of having a second scoring was to provide each of the experts the opportunity to change his/her answer following the discussion of the first risk projection amongst his/her peers and to make sure that each expert had "understood the question and scored correctly." See AR 10930-10950; GSG Emails 13380-13381.

In the second vote, panelists cast 250 votes for extinction within 100 years, and 450 votes for extinction at various intervals after 100 years.  Thus, 36% of the votes cast were for extinction within 100 years.  Three of the seven panelists cast the majority of their votes for extinction within 100 years.

Following the second scoring, the expert panel heard a FWS presentation on PECE projects.  *See AR* at p. 13381. After the presentation, the experts were asked

**Memorandum Decision – Page 14**

if they wished to revise their extinction risk estimates.  *See AR* at pp. 3381-13382.

Only one panelist opted to change his/her assessment in the third scoring.  *See AR*

at pp. 10957-10963.  Thus, after the third round of voting, and the PECE

presentation, only two of the seven panelists voted the majority of their votes for

extinction within 100 years.  Of the 700 votes cast in this third round, 28% were

cast in favor of extinction within 100 years.

**6.     12-Month Finding Process – Decision Support Team**

The FWS did not ask the expert panel to discuss, or express an opinion on,

whether the sage-grouse met the definition of "endangered" or "threatened" under

the ESA.  That decision would ultimately be made by the FWS's Director, after

reviewing a recommendation from a team of FWS managers who observed the

discussions of the expert panel.  This team – known as the Decision Support Team

– consisted of seven senior FWS biologists and managers.  Their specific task was

to evaluate whether the threats to the sage-grouse met the ESA's definition of a

threatened or endangered species.  *Id.*  In determining whether the sage-grouse met

the definition of "threatened" – that is, was likely to become extinct within the

foreseeable future – the Team chose 100 years as the outer boundary of the

"foreseeable future" because it represented ten generations of sage-grouse or two

generations of sagebrush.

**Memorandum Decision – Page 15**

The Team used a point system similar to that used by the expert panel.  Each member of the Team was given 100 points to be allocated among three possible regulatory actions on WWP's petition: not warranted, threatened, or endangered. As with the expert panel, the Team was given the opportunity to conduct a second assessment following discussion of the initial assessment. The Team's point allocations were based on consideration of the background materials compiled, the two-day discussions of the expert panelists, and the Team's own discussions about the application of the ESA's definitions of the threatened and endangered categories. 70 Fed. Reg. at 2280.

In the second scoring, 520 points were cast for a "not warranted" finding while 180 points were cast for a "threatened" finding.  No points were cast for a "endangered" finding.  Five of the seven Team members "believed that the sage-grouse would not face extinction for at least 100 years." *Id.*

According to the Director's 12-Month Finding, the Team recommended a "not warranted" finding.  There is no recommendation from the Team as a whole in the Administrative Record.  Apparently, however, the Director met with the Team on November 9, 2004, and received their verbal "recommendation." *GSG E-Mail* 4657.  Pat Deibert, a FWS biologist who prepared the 12-Month Finding, states in an e-mail that "[t]he Director seemed impressed with the work done, and accepted

the recommendation of the [Team]." *Id*.

Each member of the Team also provided hand-written comments explaining their votes. For example, one Team member who cast 80 votes for "Not Warranted" and 20 votes for "Threatened," wrote that "[s]pecies is <u>not</u> at threat of imminent extinction due to wide distribution, relative stability of core population areas, and rate of impact of the threats." *AR* at 11039 (emphasis in original).  After making other comments, this member concluded that "species doesn't meet statutory definition of [Threatened] or [Endangered] at this time." *Id.* at 11040.

The Director apparently used these hand-written comments – and his in-person meeting with the Team – to discern their analysis and conclusions. According to the Director, the Team concluded that while there are real threats to sage-grouse, two factors counseled against finding that a listing is warranted:  (1) the population is now stable; and (2) there is great uncertainty about the habitat threats.

With regard to population numbers, the Director summarized the Team consensus as follows:

> It is clear that the number of greater sage-grouse range-wide has declined from historically high levels, with well documented declines between 1960 and 1985.  However, the most recent data reflect that overall declines have slowed, stabilized or populations have increased.  These data and the fact that 92% of the known active leks occur in 10 core populations across 8 western states, and that 5 of these populations were

**Memorandum Decision – Page 17**

so large and expansive that they were subdivided into 24 sub-populations
. . . was cited by managers on the [Team] as part of the reason for their
not warranted recommendation.

*Id*. at 2281.  With regard to the uncertainty over the effects of various threats, the

Director summarized the Team consensus as follows:

The higher ranking threats, while range-wide and regional in scale, are
to a large degree prospective in nature (*e.g.*, invasive species,
infrastructure, wildfire, oil and gas development and conifer invasion).
Neither the [Team] nor the expert panelists could predict how these
threats will develop over time or interact with each other or with
different less important threats to accelerate habitat loss or other impacts
to the grouse.  This uncertainty was explicitly noted by several of the
[Team] biologists and managers as part of the reason for a not-warranted
recommendation.

*Id*.  The final recommendation of the Team was forwarded to the Director and

summarized by him as follows:

[B]ecause of the relatively long projected risk of extinction, in many
cases greater than 200 years . . . combined with considering the variety
of sources of information generated for and during the risk analysis
phase, including the expert panel deliberations and the Conservation
Assessment . . . the [Team] found that the levels of these existing threats,
although very real, when considered against the status, trends, and
distribution of the current population, were not sufficient to result in the
greater sage-grouse becoming an endangered species in the next 40 to
100 years.

### 7.    **12-Month Finding**

On January 6, 2005, the then Director of the FWS, Steven Williams,

adopting the Team's recommendations set forth above, decided that a listing was

**Memorandum Decision – Page 18**

not warranted, "after considering the compiled information, the risk assessment [by the expert panel], the applicable conservation actions, and the assessment of the [Team]." *Id.* at 2282.

## ANALYSIS

### 1.   <u>Standard of Review</u>

Because the ESA has no specific provision for judicial review of final agency actions, the scope of review is governed by the APA, 5 U.S.C. § 701 *et. seq.* Under the APA, an agency action must be upheld unless it is found to be arbitrary or capricious. 5 U.S.C. § 706(2)(A). To decide if an agency action is arbitrary and capricious, the court must determine whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made. *Pacific Coast Federation of Fishermen's Ass'n, Inc. v. NMFS*, 265 F.3d 1028, 1034 (9th Cir.2001). The agency's decision need not be a model of clarity so long as "the agency's path may reasonably be discerned." *National Ass'n of Home Builders v. Defenders of Wildlife*, 127 S.Ct. 2518 (2007)

"Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving . . . scientific matters." *United States v. Alpine Land and Reservoir Co.*, 887 F.2d 207, 213 (9th Cir.1989). Nevertheless, the "presumption of agency expertise may be rebutted if the decisions, even though

**Memorandum Decision – Page 19**

based on scientific expertise, are not reasoned." *Greenpeace v. NMFS*, 80

F.Supp.2d 1137, 1147 (W.D.Wash.2000).

Judicial review under this standard is to be "searching and careful," but

remains "narrow," and a court should not substitute its judgment for that of the

agency. *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir.1993).

## 2.   **Jurisdiction**

The FWS alleges that WWP failed to give the 60-day notice required by the

ESA before bringing suit.  *See* 16 U.S.C. § 1540(g)(2)(c).  This requirement is

jurisdictional, *Save the Yaak Comm. v. Block*, 840 F.2d 714, 721 (9th Cir. 1988).

 WWP does not need to comply with the ESA notice provisions for an APA

claim challenging the FWS's failure to perform a discretionary duty under the

ESA.  *See Bennett v. Spear*, 520 U.S. 154, 176-178 (1997).  The FWS describes its

listing decision as discretionary.  *See FWS Brief* at p. 24 (stating that "the [FWS]

exercised its expert discretion and determined that listing greater sage-grouse was

not warranted").  That decision – like all ESA listing decisions – will be reviewed

under the APA's arbitrary and capricious standard.  *See Center for Biological

Diversity v. Badgley*, 335 F.3d 1097, 1100 (9th Cir. 2003).  Because this suit is

brought under the APA, to review a discretionary decision of the FWS, *Bennett*

dictates that the ESA notice requirement does not apply.[2]

The FWS also challenges WWP's standing.  However, WWP was one of the petitioning parties before the FWS, and also submitted numerous public comments. This is sufficient to confer standing.  *See Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995).

3.   **Best Science**

The FWS is required to base its listing decision "solely on the basis of the best scientific and commercial data available . . . ." 16 U.S.C. §1533(b)(1)(a).  Of the three entities that played a role in the FWS's listing process – expert panel, Decision Support Team, and Director – it was the expert panel that had the extensive knowledge of the sage grouse and its habitat.  Accordingly, the "best science" was represented by the expert panel.

What does the record reveal about the "best science" coming out of the expert panel?  The panel prepared no written report, and the FWS made no transcript of their two days of verbal discussions.  We do have their vote totals, specifically the results of the second round of voting.  If you count heads, three of the seven experts concluded that the sage grouse would be extinct within 100

---

[2]  WWP's counsel stipulated at oral argument that he would not seek attorney fees under the ESA.

**Memorandum Decision – Page 21**

years.  If you count votes, the probability that the sage grouse will be extinct in 100

years is, after the second round of voting, (1) 36% range-wide; (2) 52% in the

eastern portion of their range; and (3) 40% in the western portion of their range.

　　　None of this voting analysis was discussed in the 12-Month Finding.  The

Director completely ignored the second-round percentage figures, and counted

heads inaccurately:  He concluded that only two of the seven experts voted for

extinction.  *See 70 Fed. Reg.* at p. 2280.  To get that result, the Director had to rely

on the third round of voting, where one expert changed his/her vote after hearing a

presentation on conservation efforts that met the PECE criteria.  However, earlier

in his decision, the Director stated that he had not "evaluate[d] whether the planned

conservation efforts that met PECE reduced the threats to the species."  *Id*. at 2245.

If the Director failed to evaluate those conservation efforts, he cannot rely on a

vote tally that appears so clearly to depend on those efforts.  *See generally,*

*Federation of Fly Fishers v. Daley*, 131 F.Supp. 2d 1158 (N.D.Cal. 2000)(holding

that in making listing decision, agency cannot rely on unproven conservation

measures).

　　　With regard to the percentage figures, they were not evaluated either by the

Director in his 12-Month Finding, *see 70 Fed.Reg. 2244 et. seq.,*or by the Decision

Support Team, *see AR* at 11031 to 11043.  Was that failure arbitrary and

**Memorandum Decision – Page 22**

capricious?  To be a "threatened" species under the ESA, the sage-grouse must be

"likely" to "be in danger of extinction" within 100 years.  Here, the FWS defined

"likely" as meaning "more likely than not," which is a probability of 50% or

greater.  *See AR* at 9059.[3]  The phrase "in danger of" was defined to "imply a risk

sufficiently high to warrant immediate action."  *Id.* at 9058.

Putting all these terms together, the sage grouse is threatened if there is at

least a 50% probability that it will be "in danger of" extinction within 100 years.

The experts here found that range-wide, there is a 36% chance that the sage grouse

will *be* extinct in 100 years, not merely that it will be *in danger of* extinction.  Is

that akin to a 50% chance that it will be *in danger of* extinction?  It certainly is

close enough to warrant a full discussion.

The need for a full discussion becomes even more compelling when

considering the east/west figures of 52% and 40% respectively.  Once again, those

are risk assessments that the sage grouse will be extinct, not merely that it will be

in danger of extinction, within 100 years.  These figures clearly put the extinction

danger close enough to the FWS definitions quoted earlier to merit a full

evaluation.

---

[3] One court in this Circuit has approved this definition of "likely."  *Trout Unlimited v. Lohn*, 2007 WL 2973568 (D.Or. July 13, 2007).  This definition has not been challenged here, and thus the Court expresses no opinion on that definition.

Because the FWS did not preserve for the record any explanation by the experts of these percentages, the Court is forced to look elsewhere for their significance.  In considering whether to list the Queen Charlotte goshawk, the FWS modified criteria set by the International Union for the Conservation of Nature (IUCN) to determine that the goshawk would be "threatened" "if at any point in the next 100 years there is a 20 percent chance that the species would become extinct." *Southwest Center for Biological Diversity v Norton*, 2002 WL 1733618 (D.D.C. 2002).  The same 20% risk was used by the FWS in deciding whether to list the Alexander Archipelago wolf.  *AR* at 11750.  While the FWS is not bound in this case by either the IUCN criteria or the 20% figure used in other cases, these guidelines signal that the even-higher risk assessments here are significant enough to at least warrant discussion.

As mentioned, the record contains no transcript or detailed account of the experts' two days of discussion in the presence of members of the Decision Support Team.  In other words, the FWS failed to adequately preserve for the record the "best science."  This makes it impossible for the Court to review whether the Team and the Director accurately applied the "best science" represented by the expert panel.  The Court is forced to rely on their recollections of the experts' discussions with no way to verify whether those recollections are

accurate.

The consequences of this failure were compounded when the FWS excluded the experts from the listing determination.  It was the Team who would make the recommendation to the Director, but they were not sage grouse experts.  In the absence of the experts, it was imperative that the Team recall accurately what the experts had said.

What an odd process.  Right at the moment where the "best science" was most needed, it was locked out of the room.  The FWS argues that it cannot be compelled to cede control of a listing decision to experts.  But the argument misses the mark.  By excluding the experts from making even a recommendation, and then failing to document the experts' discussions (beyond their votes), the FWS cannot demonstrate that is applied the "best science."

The FWS points out that the Director specifically found that "it was decided by consensus that there was not a significant portion of the range in which threats to sage-grouse are greater than range-wide threats."  *See 70 Fed.Reg.* at 2281.  It is not clear whether the "consensus" was that of the experts, the Team, or both.  Whatever the grouping, the "consensus" does not square with the experts' voting results.  While the experts found a 35% range-wide risk of extinction, the risk jumped to 52% in the eastern region.  The only way to explain the Director's

**Memorandum Decision – Page 25**

conclusion that 52% is not greater than 36% is to assume that the eastern region is not a "significant portion of the range." But that assumption is nowhere explained. The FWS cannot demonstrate that the Director's account of the "consensus" is accurate.

The FWS used this same flawed process in deciding not to list the slickspot peppergrass. *See WWP v. Foss*, 2005 WL 2002473 (D.Idaho 2005). There, a court in this District reversed the FWS's decision, expressing concern that the FWS was asking the court to assume "that FWS's managers had a special insight into slickspot peppergrass, which its panel of experts did not possess," and that there was no "means of reviewing its decision." *Id.* at *17. While *Foss* is not directly on point, its deep concerns about the FWS's decision-making process are shared by this Court.

For all these reasons, the Court cannot find that FWS used the "best science" as required by 16 U.S.C. §1533(b)(1)(a). Accordingly, the Court finds that the FWS 12-Month Finding is arbitrary and capricious under § 706 of the APA.

## 4.   **Habitat**

The Director's 12-Month Finding concluded that "[s]ervice biologists determined that the principal habitat-related threats are not proceeding at a rate that will threaten the continued existence of the species within the foreseeable future."

*See 70 Fed.Reg.* at 2267.  By "service biologists" the Director is referring to the Decision Support Team.  The Administrative Record contains no findings by the Team as a whole on habitat.  There are the notes of individual team members and the results of their voting.  It appears the Director cobbled these together – along with his off-the-record in-person meeting – to reach his conclusion about the Team's "determination."

This process is flawed for a number of reasons.  First, the Team was not comprised of experts on sage-grouse habitat – that was the province of the expert panelists and the experts who prepared the Conservation Assessment (CA).  What did the expert panelists say specifically about sage-grouse habitat and its "rate" of decline?  We don't know because their discussions were off-the-record.

The Director says that "the majority of the expert panel did not believe that these threats were occurring at such a rate to cause the extinction of the greater sage-grouse within the next 60 to 100 years."  *Id.* at 2267.  Yet we know that three of the experts did so believe, judging from their voting.  Why were their views not even discussed?

The experts who compiled the CA certainly had a gloomy outlook for sage-grouse habitat.  As discussed above, the CA concluded that habitat threats like invasive weeds, fire, and energy development were all on the increase.

**Memorandum Decision – Page 27**

The Director acknowledged these threats by citing to various examples that confirmed the CA's analysis:  (1) "[w]ildfires have removed extensive areas of sagebrush habitat in recent years," *id*. at 2265; (2) "the rapidity of [energy] development and the persistent demand for petroleum products," is the primary threat in the east region, and the current Administration has taken action to "expedite projects that will increase the production, transmission, or conservation of energy,"*id.* at 2273*;* and (3) "cheatgrass has invaded extensive areas in western parts of greater sage-grouse range, supplanting sagebrush plants upon which sage-grouse depend," *id.*

Nowhere is sage-grouse habitat described as stable.  By all accounts, it is deteriorating, and that deterioration is caused by factors that are on the increase. However, the Director concludes that the "rate" of this deterioration is not fast enough to cause alarm.  While that finding has no support in the CA, the Director states that he is relying on determinations made by both the Team and the expert panelists.  *Id*. at 2267.  Once again, however, the Team is not comprised of habitat experts; the "best science" comes from the expert panelists who made no specific "determinations" on the record concerning habitat.

Another example of the Director's failure to make a rational connection between the "best science" and his decision is his discussion of the destruction of

habitat by conversion to agricultural use.  He acknowledges that this conversion

has destroyed "many square miles of sagebrush habitat" over time, but concludes

that "this conversion occurs at such relatively low levels today that we do not

consider it a threat to the greater sage-grouse on a range-wide basis."  *Id*. at 2255.

That conclusion comes out-of-the-blue with no support in the discussion that

precedes it.  Moreover, it is directly contradicted by the CA, which concludes that

"[l]ands continue to be converted to agriculture because technological advances in

irrigation methods now permit expansion into steeper terrains further from river

flood plains."  *See CA* at p. 13-6.

      The Director himself recognized that the CA was authoritative and objective,

*see 70 Fed. Reg.* at 2249, yet failed to explain why he departed from its

conclusions on habitat.  The ESA requires the Director to consider the "present or

threatened" destruction of habitat.  16 U.S.C. § 1533(a)(1).  The FWS must make a

rational connection between the facts found and the choices made.  *Pacific Coast*

*Federation of Fishermen's Ass'n, Inc. v. NMFS*, 265 F.3d 1028, 1034 (9th

Cir.2001).  That rational connection cannot be discerned here.  Thus, the Court

finds that the Director's 12-Month Finding is arbitrary and capricious.

**5.**    **<u>Existing Regulatory Mechanisms</u>**

      The FWS is required to determine whether the "inadequacy of existing

regulatory mechanisms" warrants listing the sage-grouse. *See* 16 U.S.C.

§ 1533(a)(1)(D). Accordingly, the FWS reviewed the regulatory mechanisms on

state and private lands that accounted for about 32% of sage-grouse habitat. The

FWS concluded that it "does not have complete information" about state

endowment lands, and was "not aware of any county or city ordinances that

provide protection specifically for the greater sage-grouse or its habitats on private

land." *See 70 Fed.Reg.* at 2271, 2272.

With regard to federal regulations, about 46% of sage-grouse habitat is on

BLM administered land. *Id*. at 2272. The principal threat in the eastern region was

energy development, and so the FWS reviewed how the BLM was protecting sage-

grouse from energy development. The FWS concluded that it had no information

on (1) how many "older" oil and gas leases had stipulations that addressed sage-

grouse protections; (2) how many more-recent leases were granted exceptions,

modifications, or waivers of stipulations pertaining to sage-grouse protections; and

(3) the results of Best Management Practices that were designed by the BLM to

improve sage-grouse habitat.

Despite these gaps of information for 78%[4] of the sage-grouse's habitat, the

---

[4] The 78% is computed by adding the BLM land (46%) with the state and
private land (32%).

Director was "encouraged that sage-grouse and sagebrush conservation efforts will

moderate the rate and extent of habitat loss for the species in the future." *Id*. at

2279.  He never explained why the information gap did not matter.  And he never

explained what had changed since his 90-day finding, which concluded that habitat

degradation and population declines indicated that existing regulatory mechanisms,

particularly at the federal level, "may be inadequate with regard to addressing

threats to the species." *See 69 Fed.Reg.* At 21492.  And finally, he never explained

how he could be "encouraged" by conservation efforts while at the same time

finding that "it was not necessary to rely on the contributions of any of the local,

State, or other planned conservation efforts that met the standard in PECE." *See 70

Fed.Reg.* At 2244.

   While an agency may reach different conclusions than those signaled in the

90-day finding, it must explain why. *See Northwest Ecosystem Alliance v.

USFWS*, 475 F.3d 1136 (9th Cir. 2007).  Lacking data on existing programs, and

deciding not to review the PECE conservation programs, the Director must have

been relying on his assumptions about future conservation efforts; assumptions that

"cannot be relied upon in an agency's decision not to list." *See Trout Unlimited v

Lohn*, 2007 WL 2973568 at *25 (D.Or. July 13, 2007).

   The FWS's failure to coherently consider the adequacy of existing

regulatory mechanisms renders its decision arbitrary and capricious.

**6.    Julie MacDonald**

Julie MacDonald was a Deputy Assistant Secretary with responsibility for overseeing FWS operations, including its ESA reviews.  She participated in the sage-grouse review at issue here.

In 2006, the Office of Inspector General (OIG) received an anonymous complaint that MacDonald had "persistently harassed, bullied, and insulted FWS employees to change documents and ignore good science related to the Endangered Species Program."  *See OIG Report* at p. 4.  The former Director of the FWS Endangered Species Program told OIG investigators "that many of the scientific reports his office has issued have been edited extensively by MacDonald, who has no background in biology, and cited the Sage Grouse Risk Analysis as an example."  *Id*.  He explained that MacDonald "bypassed managers to speak directly with field staff, often intimidating and bullying them into producing documents that had the desired effect she and the former Assistant Secretary wanted."  *Id*.  MacDonald's goal, this source stated, was that she "did not want to accept petitions to list species as endangered."  *Id.*

The OIG Report is filled with instances of MacDonald's attempts to improperly alter the "best science" findings.  Specifically with regard to the sage-

grouse review at issue here, the Portland Assistant Regional Solicitor for the FWS said that MacDonald's conduct in the sage-grouse review was "'the most brazen case of political meddling' he had seen." *Id*. at p. 12.

The Administrative Record in this case contains e-mails that confirm the OIG Report accounts. One example deals with the evaluation of existing regulatory mechanisms to protect the sage-grouse. The Court noted above that there was a singular lack of data on measures taken by the BLM to protect the sage grouse from energy development, the single largest risk in the eastern region. The e-mails show that the FWS staff was repeatedly frustrated in their attempts to obtain the data from the BLM. *See GSG Emails 4385.* Accordingly, an early draft of the staff's analysis – designed to be presented to the expert panel and Decision Support Team – stated as follows: "While the BLM has regulatory mechanisms to manage conserve [*sic*] greater sage-grouse habitat on the lands they manage, we have no specific data regarding specific implementation of the above regulations for this species, or the monitored results. Therefore we are unable to evaluate the effectiveness of these regulations for the protection of sage-grouse and their habitats on BLM lands." *Id.*

MacDonald responded to this e-mail two days later, stating that she and others would "help you [the staff] do the assessment of existing regulatory

protections for the sage-grouse." *See GSG Email* 13074.  The revised version deleted the language quoted above.

This is just one of many examples in the record.  MacDonald had extensive involvement in the sage-grouse listing decision, used her intimidation tactics in this case, and altered the "best science" to fit a not-warranted decision.

This Court is not the first court to notice MacDonald's tactics.  In *Center for Biological Diversity v. FWS*, 2005 WL 2000928 (N.D.Cal. 2005), the court set aside a FWS decision under the ESA due to an "irregularity" in the FWS process.  Specifically, the court cited pressure from MacDonald to reach an "ordained outcome" regardless of the best science.  *Id*. at *15.

MacDonald's principal tactic is to steer the "best science" to a pre-ordained outcome.  That may explain why so much of the "best science" in this case was verbally communicated and never reduced to writing in any analytical or rigorous manner.  This process allows the ultimate decision-makers to subjectively bend the "best science" to their own ends, while obscuring any inconsistencies.  In other words, MacDonald's principal tactic dovetails precisely with the principal weakness in this case.  For that reason, MacDonald's extensive involvement in the sage-grouse listing decision is an independent reason for the Court's finding that the Director's 12-Month Finding is arbitrary and capricious under the APA.

**Memorandum Decision – Page 34**

**6.**   **<u>Conclusion</u>**

For the reasons expressed above, the Court finds that the 12-Month Finding contained in 70 Fed. Reg. 2244 *et. seq.* is arbitrary and capricious under the APA. Accordingly, the Court will grant WWP's motion for summary judgment, reverse the FWS's decision, and remand the case to the agency for further consideration. The Court will deny the other motions, and will issue a separate Judgment as required by Rule 58(a)(1).



DATED:  **December 4, 2007**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision – Page 35**